UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| BEN-TREI FERTILIZER COMPANY, L.L.C. | CIVIL ACTION |
| VERSUS | NO. 08-5204 c/w 09-4572<br>Filed in: 08-5204 |
| CELTIC MARINE CORPORATION,<br>INGRAM BARGE COMPANY, and<br>ONEBEACON INSURANCE COMPANY | SECTION "C" (2) |

**ORDER AND REASONS**[1]

This matter comes before the Court on motion for summary judgment filed by Celtic Marine Corporation ("Celtic"), two motions for partial summary judgment filed by Ingram Barge Company ("Ingram") and motion for summary judgment filed by OneBeacon Insurance Company ("OneBeacon"). Having considered the record, the memoranda of counsel and the law, the Court rules as follows.

FACTS

In the lead case, the plaintiff, Ben-Trei Fertilizer Company, L.L.C. ("Ben-Trei") sues Celtic and Ingram under admiralty and diversity jurisdiction for breach of "obligation," negligence and negligent interference, failure "to protect" cargo, breach of

---

[1]Kayvon Sarraf, a third-year student at Tulane University Law School, assisted in the preparation of this Order and Reasons.

1

settlement agreement by Ingram, and "the sale ... of a portion of [cargo] ... to [sic] the failure to tender that money to Ben-Trei,." (Rec. Doc. 1, ¶ 17). It sues OneBeacon for insurance coverage and penalties. (Rec. Doc. 1, ¶¶ 19-21). In its Supplemental Complaint filed on July 8, 2009, after three motions had been filed, the plaintiff amended its complaint to add Ben-Trei, Ltd. as a party plaintiff.[2] Ben-Trei seeks to recover both for the physical damage to certain cargo and for economic losses it allegedly suffered because cargo was not properly directed.

Ben-Trei is a marketing and distribution company dealing in fertilizer with customers around the United States. Celtic is a broker that arranges for the transportation of cargo for customers including Ben-Trei. Ben-Trei and Celtic entered into a contract, the 2008 Annual Service Agreement, to provide for the transportation of 42 barges during the year 2008. Celtic acted as an intermediary between Ben-Trei and carriers/barge owners, including Ingram, to facilitate the transportation of cargo.

It is undisputed that on July 28, 2008, Ben-Trei entered into an Sales Contract with Growmark, Inc. ("Growmark") in which Ben-Trei sold to Growmark one barge-load, 1,543.87 short tons, of domestic granular urea at a price of $792.75/short ton. Pursuant to this contract, title and risk of loss of the urea were to pass from Ben-Trei to Growmark at the barge's rail as the product was loaded onto the barge in New

---

[2]The two plaintiff entities will jointly be referred to as "Ben-Trei."

Orleans.[3] Celtic arranged for Ingram to carry the urea intended for Growmark from New Orleans to East Liverpool, Ohio aboard Ingram's ING-7581. The cargo was loaded onto that barge on August 28, 2008. Also around this time, Celtic had arranged for additional barges, including ING-5537 and IN-075115, to transport other urea purchased by Ben-Trei for sale to other customers.

It is also undisputed that on September 1, 2008, Hurricane Gustav struck the Gulf Coast, causing a fleet breakaway at the Darrow Fleet where the ING-7581 was stored, damaging the barge's covers. This resulted in part of the domestic granular urea becoming wet and damaged. With Hurricane Ike looming, Ben-Trei contacted Celtic and requested that the cargo be covered with tarps or that temporary repairs be made by Celtic or Ingram to ING-7581 to protect the cargo from Hurricane Ike. Tarps had already been placed over the cargo on September 8, 2008, in preparation for Ike's

---

[3]The Ben-Trei/Growmark Sales Contract specifically provides:
7. RISK OFLOSS/INSURANCE: Title to and risk of loss of the product shall pass from Seller to Buyer at the barge's rail as the product is loaded into such barge at the delivery point.
The Sales Contract also provided that:
> This Contract shall be governed by, and construed and enforced in accordance with the laws of the State of Oklahoma, United states of America, without regard to its provisions concerning conflict of laws. If any provision hereof be held invalid or unenforceable, the remaining provisions shall be nonetheless valid.

The parties apparently agree that the terms of the Oklahoma Commercial Code govern the rights and obligations between Ben-Trei and Growmark.

arrival, yet Ike passed near the Port of New Orleans on September 13, 2008, damaging or blowing off the tarps and possibly causing further damage to the urea.

Despite damage to the cargo, Growmark still agreed with Ben-Trei to accept the cargo aboard ING-7581, subject to Ben-Trei's commitment to be responsible for the damaged cargo. The barge remained in New Orleans and was now to be transported to Growmark in East Liverpool, Ohio on October 3, 2008. Ingram, however, instead transported ING-5537 to East Liverpool. Ingram claims that it did so at the request of Celtic, while Celtic maintains that it neither ordered nor instructed Ingram to do so. Ben-Trei never released ING-5537 to East Liverpool, nor did it instruct Celtic to do so. Growmark, despite ING-5537 containing imported urea rather than domestic granular urea, accepted the cargo aboard ING-5537 in place of the cargo it was to receive on ING-7581.

The incorrect shipment of ING-5537 to East Liverpool allegedly began a chain of events that required a redirection of other barges for Ben-Trei to meet its sales obligations to various customers. Because ING-5537 was sent to Growmark, IN-075115 had to be redirected to another customer in its place. Ben-Trei then purchased an additional 60 truck loads of urea to replace the cargo aboard IN-075115 to meet its local customer obligations.

As all this unfolded, ING-7581 remained in the Port of New Orleans and its cargo

was eventually transloaded onto two barges, the damaged cargo (114.473 short tons, or approximately 12% of the overall cargo) loaded aboard ING-7628 and the undamaged cargo loaded aboard ING-7700 (1429.401 short tons). The undamaged cargo was delivered to Ben-Trei's facility in Oklahoma on October 31, 2008, where it was able to sell this domestic granular urea for $250/short ton, a significant loss as a result of a sharp decline in the fertilizer market. Ingram sold the damaged cargo (101.520 short tons) for salvage at a cost of $127.50 per short ton for a total of $12,943.80. Ben-Trei claims that Ingram did not inform Ben-Trei about this sale and Ben-Trei had no knowledge of it until receiving Celtic's motion for summary judgment in this case.

## STANDARD FOR SUMMARY JUDGMENT

In general, a district court can grant a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp v. Catrett*, 477 U.S. 317 (1986). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a]

factual dispute ... [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party ... [and a] fact ... [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995) (citing *Celotex*, 477 U.S. at 322-24). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50.[4]

DISCUSSION

**Real Party in Interest**[5]

Celtic and Ingram raise the issue of "standing," specifically, whether Ben-Trei

---

[4]Ben-Trei originally argued in the alternative that more time for discovery was needed. At this time, adequate discovery has been conducted.

[5]The parties characterize the issue as one of "standing," with reference Fed. R. Civ. P. 17(a), which pertains to real party in interest. The two concepts are often confused but distinct. Charles Wright, Arthur Miller & Mary Kay Kane, *Federal Practice & Procedure: Civil* §§1542, 3531 (West). The Court construes the arguments made as pertaining to Rule 17(a) real party in interest status.

6

can sue for any damage concerning the cargo on the ING-7581 under the Sales Contract between them.  The defendants' argument is simple to understand: Ben-Trei did not have legal title to the cargo once it was loaded onto the ING-7781 under the terms of its Sales Contract with Growmark providing that title and risk of loss passed at the barge rail.

In its opposition, Ben-Trei argues that it has the right to sue because "[i]t is Ben-Trei, not Growmark, that has suffered a loss in this instance."  (Rec. Doc. 15, p. 12).  Specifically it argues that title to the cargo at the time of the damage is irrelevant because "Growmark effectively rejected ING-7581's cargo," and/or "Growmark never accepted ING-7581's cargo," causing title to revest in the plaintiff.[6]  The plaintiff alternatively argues that even if title did not "technically pass to Ben-Trei," it is entitled to pursue a claim for the damaged cargo because and, alternatively, it is "equitably subrogated to Growmark's rights in this cargo."   (Rec. Doc. 38, p. 12).

The right to sue issue with regard to the cargo on the ING-7581 focuses on the contractual relationship between Ben-Trei and Growmark.  Rule 17(a)(3) provides in full as follows:

> The court may not dismiss an action for failure to prosecute in the name of

---

[6]The plaintiff also argued that "[t]here was never a sale confected between Ben-Trei and Growmark such that title passed to Growmark."  (Rec. Doc. 38, p. 2).   It also restated that title was "revested" in the plaintiff's favor and that the revesting is not a sale.  (Rec. Doc. 38, pp. 9-10).

the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action. After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

According to the Advisory Committee in its Note to the 1966 Amendments to Rule 17(a), "the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata."

Generally, when title to goods passes to the buyer upon being placed in the possession of the carrier, the seller no longer has any interest in the goods and has no standing to sue. *York-Skipley, Inc. v. Atlantic Mutual, Ins. Co.*, 474, F.2d 8 (5th Cir. 1973). It is undisputed that Growmark, the buyer, has never been a party to this suit, and no ratification, joinder or substitution for purposes of Rule 17(a) has occurred.[7]

Plaintiff first argues that the cargo was "rejected" by Growmark, as that term is used under Oklahoma law and the Uniform Commercial Code ("U.C.C.").[8] *Armco Int'l*

---

[7]The Court's uncertainty as to whether or not a written assignment actually existed caused it to order supplemental memoranda on that issue, and the plaintiff subsequently obtained a written "Transfer, Assignment and/or Subrogation of Rights" from Growmark in November 2009 during the pendency of these motions. It appears to be undisputed that no transfer, assignment of rights or subrogation involving Growmark occurred until after this suit was filed and the issue of standing raised.

[8]Section 2-401(4) of the Uniform Commercial Code, which both parties agree governs in this case, provides: "A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests

8

*Corp. v. Rederi A/B DISA*, 151 F.2d 5 (2d Cir.1945); *Marine Office of America Corp. v. Lilac Marine Corp.*, 296 F. Supp. 2d 91 (D.P.R. 2003); *Int'l Freight Forwarding, Inc. v. American Flange*, 993 S.W.2d262, 267-268 (Tex. App. 1999). Despite the fact that the legal rights and remedies as between Ben-Trei and Growmark derive from the Sales Contract, which provides that it is governed by the Oklahoma law, no party provides a full discussion of what that law provides. The Court acknowledges that Ben-Trei relies on Section 2-401(4)'s reference to "rejection," but with no cite to any other provision of the Oklahoma Commercial Code or Oklahoma caselaw as to what is considered a "rejection."

In the absence of stated authority, the Court finds that an agreement to substitute cargo is not clearly the legal equivalent of "rejection" or "revocation of acceptance" of another shipment of cargo, particularly when Ben-Trei is relying on that as a legal basis to vest title from Growmark to Ben-Trei for the original shipment. The cargo on the ING-7781 was never actually "rejected" by Growmark; rather the parties agreed to substitute cargo. The cargo on the ING-7781 was never even delivered to Growmark. Had Growmark "rejected" the substitute cargo, a different scenario would exist.

---

title to the goods in the seller. Such revesting occurs by operation of law and is not a sale."

Instead, Ben-Trei and Growmark effectively renegotiated their Sales Contract.[9] Under these circumstances, the Court can not clearly find implied or express "rejection" or "revocation of acceptance" for purposes of the U.C.C. provisions incorporated in the Oklahoma Commercial Code.

The fact that the parties apparently decided to forego any legal remedies they had concerning the Sales Contract also affects the plaintiff's argument that it is entitled to equitable relief.[10] Ben-Trei looks to equity for the benefits of the law to which it might have been entitled had it exercised its legal rights. None of the rights to which Ben-Trei relies were ever triggered, however, because of what is voluntary action on the part of Ben-Trei to acquiesce to the sale of the substitute cargo. Although its conduct may have served immediate business purposes, Ben-Trei can point to no legal or equitable principle requiring it to intercede in the way it did and to pass along the risk that market conditions might change to a third party.[11] Nevertheless, the Court is sympathetic to Ben-Trei's efforts to make the best of a bad situation after the wrong cargo was delivered through no fault of its own.

---

[9]No explanation as to why a formal transfer, assignment or subrogation was not negotiated at that time is provided.

[10]The Court notes that the Oklahoma Commercial Code contains specific provisions on market price fluctuations, which may or may not be relevant here.

[11]It is also unclear to the Court if the allegedly negligent third parties approved the renegotiated contract settlement between Ben-Trei and Growmark.

Despite the fact that Ben-Trei has not clearly established that it is the real party in interest, the Court has determined that summary judgment on the issue is inappropriate and remains for trial.   The Court believes enough significant facts are in dispute or at least unclear to warrant simply taking the matter to trial.   Without explanations and arguments  that include all facts concerning all the barges, the inconsistency between the contracts and the conduct of the relevant parties, summary judgment is simply inappropriate.   The fact that this matter is set for a trial before the Court without a jury only reinforces the Court's conclusion that summary judgment on this issue is not warranted.

**Physical damage to proprietary interest**

In their motions, Celtic and Ingram also argue that Ben-Trei lacks a sufficient proprietary interest in the cargo on ING-7581to warrant the award of non-pecuniary losses under *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927) and *State of La. v. M/V TESTBANK*, 752 F.2d 1019, 1023 (5th Cir. 1985)(en banc), and the rule established therein that there can be "no recovery for economic loss absent physical injury to a proprietary interest."  Celtic challenges Ben-Trei's right to consequential damages related to alleged negligent interference with Ben-Trei's business interests. Celtic argues that Ben-Trei lacks both a physical injury and a proprietary interest, and that Ingram would be liable "for any loss of or damage to the shipment described …"

11

under its 2008 Annual Service Agreement with Ben-Trei. (Rec. Doc. 21, p. 2, Exh, A-1, p. 7). Ingram, on the other hand, argues that it never had a contract with Ben-Trei, plus repeats Celtic's argument that the only physical damage of which Ben-Trei complains is to a portion of the cargo on ING-7581, to which title had passed to Growmark at the time of damage.

Ben-Trei argues that it has a proprietary interest in the cargo on ING-7581 because it suffered damages when the wrong barge was sent to Growmark and that the issue of title at a certain time is irrelevant.[12] The Court construes this fact-driven argument as essentially identical to the question of the real party in interest. Although Ben-Trei falls short of clearly establishing a proprietary interest or physical damage at the relevant time, the Court will again defer ruling for the reasons previously described.

Ben-Trei also argues that it is not limited to a tort action vis-a-vis Celtic because it had a contractualy relationship, taking it outside the scope of *Robins Dry Dock*. As for Celtic's argument with regard to indirect damages, Ben-Trei's argument is that Celtic had the contractual responsibility to see that the cargo was delivered to the correct destination, a responsibility independent of whatever rights Ben-Trei might have against Ingram. Clearly the cargo was misdelivered. Celtic and Ingram dispute whose

---

[12]Although not addressed in its argument, in order to establish a proprietary interest under *Robins Dry Dock*, Ben-Trei needs to show actual possession or control, responsibility for repair and responsibility for maintenance. *IMTT-Gretna v. Robert E.Lee SS*, 993 F.2d 1193, 1994 (5th Cir. 1993).

fault that was and summary judgment is therefore inappropriate.

In its second motion for partial summary judgment, Ingram turns its focus to contractual language as prohibiting the recovery of certain items of damges. It specifically challenges Ben-Trei's claim for surveying fees and lost profits, allegedly reflected by subtracting the proceeds from the sale of the undamaged cargo from the original contract price with Growmark. Ingram argues that it acted as a private carrier, and all rights and obligations are governed by the Transportation Agreement between Celtic and Ingram. It argues that the 2008 Annual Service Agreement between Celtic and Ben-Trei relieved it of liability for loss profits and consequential damages.[13] It further argues that the prohibition is reflected in its Transportation Agreement with Celtic and that those terms of which were expressly incorporated in the 2008 Annual Service Agreement.[14] (Rec. Doc. 63, Exhs. A, B).

---

[13] There is language in the Service Agreement which states that "Carrier shall not be liable for lost profits or other consequential damages under any circumstances." The Service Agreement also provides that "the term Carrier as used herein shall not be deemed to include Celtic Marine Corporation, but shall include any person or organization rendering the transportation service hereunder." It also provides "the term 'Seller' as used herein shall refer to Celtic Marine Corporation."

[14] The section of the 2008 Annual Service Agreement entitled "CARRIER'S TERMS INCORPORATED provides:
> In addition to the terms and conditions set forth in this Contract, the services performed hereunder are subject to the schedule or rules, regulations, terms and conditions published by the Carrier as in effect on the date hereof, a copy of which is available to the Buyer. In the event of any inconsistency or conflict between such schedule and this Contract, this Contract shall govern.

Ben-Trei opposes the motions with the argument that it did not consent or agree to the separate terms and conditions upon which Ingram relies because it did not receive a copy of Celtic's contract with Ingram. While Ben-Trei's clearer claim appears to be against Celtic, based on contract, this Court is not inclined to dismiss Ingram from this suit absent a better record. Although not argued by Ben-Trei, the Court could not locate, for example, a copy of any of the referenced "schedule or rules, regulations, terms and conditions published by the Carrier" that were allegedly incorporated in the 2008 Annual Service Agreement. Because of this apparent evidentiary omission and other factual ambiguities, this argument fails on summary judgment.

**Celtic: other issues**

Both Celtic and Ingram argue that they are not liable for any damage to ING-7581's cargo, as such damage was caused entirely by Hurricanes Gustav and Ike, which constitute Acts of God and/or *force majeure.* (Rec. Doc. 14, p. 14). In admiralty law, hurricanes are consistently considered to be acts of God. *Dammers & Van Der Heide Shipping & Trading (Antilles), Inc. v. Steamship Joseph Lykes*, 425 F.2d 991 (5th Cir. 1970). Defendants are relieved of liability if they undertook reasonable preparations in light of the anticipation of the severity of the impending storm, measured against the standard of reasonableness of prudent men familiar with the ways and vagaries of the sea. *Id.* at

---

(Rec. Doc. 63, Exh. A, p. 7)

995.

Furthermore, the 2008 Annual Service Agreement between Celtic and Ben-Trei contains the following language under "FORCE MAJEURE:"

> Neither party to this Contract shall be liable in any respect for failure or delay in the fulfillment or performance of this Contract if hindered or prevented by....acts of God, or any cause of like or different kind beyond the reasonable control of the parties of this Contract.

Ben-Trei and Celtic do not dispute whether or not Hurricanes Ike and Gustav constituted Acts of God. Ben-Trei argues that Celtic did not act reasonably to protect the cargo in preparation for the storms. The Court finds that the issue of the reasonableness of its conduct is not appropriate for summary judgment.

Celtic next argues that the 2008 Annual Service Agreement precludes an award of consequential damages under any circumstance. (Rec. Doc. 14, p. 16). Its argument does not specify which provision of that agreement so provide, and the Court's reading of the agreement fails to reveal such a provision. Summary judgment on this issue is denied.

Finally, Celtic argues that Ben-Trei owes it defense and indemnity under the 2008 Annual Service Agreement. (Rec. Doc. 14, p. 18). It relies on a provision of the agreement pertaining to "CARRIER LIABILITY:"

> Further, [Ben-Trei] agrees that it will defend, hold harmless, and indemnify [Celtic] in the event that [Ben-Trei's] underwriters, insurer, agents, or any other entity seeks recovery on account of or behalf of [Ben-Trei] against

15

[Celtic] for such losses or damages.

This provision only applies to potential suits from "other entity" third parties, however, and the present suit is filed by Ben-Trei. The Court finds that the provision is not applicable.

**Insurable Interest**

Defendant OneBeacon moves for summary judgment on the grounds that Ben-Trei sustained no damages that are covered under the applicable insurance policy issued to Ben-Trei. It argues that the "RISK OF LOSS/INSURANCE" provision of the Sales Contract between Ben-Trei and Growmark specifically provided that the cargo belonged to Growmark at the time it was damaged. It also argues that the Ocean Marine Open Cargo Policy is commonly known as an "all risks" policy that insures against "all risks of direct physical loss of or damage to the subject matter insured from any external cause" and excludes any claim for "loss of market or for loss, damage, or deterioration arising from delay, whether caused by a peril insured against or otherwise." The policy further states that it covers all shipments in which "the Insured has an insurable interest, whether made by or to the Insured, for their own account as principals or as agents for others."

Ben-Trei again repeats its "proprietary interest" argument in opposition and argues that the language in the Sales Agreement between it and Growmark does not

16

govern because of the facts of the case, which entitling it to "revested" and "equitable" title. Ben-Trei also argues that insurable interest is broader than title and that under federal admiralty law, insurable interest means "any pecuniary interest" under *ABB Power T&D Company, Inc. v. Gothaer Versicherungsbank Vvag*, 939 F.Supp. 1568, 1580 (S.D. Fla. 1996).

The United States Supreme Court has made clear that in admiralty law, an insurable interest in goods goes beyond holding title or a security interest in the goods. In *Hooper v. Robinson*, 98 U.S. 528, 537 (1878), it stated, "A right of property in a thing is not always indispensable to an insurable interest. Injury from its loss or benefit from its preservation to accrue to the assured may be sufficient, and a contingent interest thus arising may be made the subject of a policy." In *Harrison v. Fortlage*, 161 U.S. 57 (1896), it considered the question of whether a buyer of goods possessed an insurable interest in them prior to transfer of title. It declared "it is well settled that any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss, whether he has or has not any title in, or possession of the property itself." *Id.* at 65.

Problematic for Ben-Trei, the Sales Contract between Ben-Trei and Growmark stipulated that title *and* risk of loss transferred to Growmark once the goods were successfully loaded at the rail. Some of its cases dealt with a situation where either the

17

goods were damaged prior to the plaintiff receiving title or the goods were damaged prior to the insurance policy officially becoming effective. Here, the undisputed facts indicate that damage to the goods occurred after title and risk of loss passed to Growmark.

The Court recognizes that the plaintiff maintains its position that an insurable interest could derive from Ben-Trei's alleged "revested" or "equitable" title or proprietary interest. It also recognizes that Ben-Trei has not directly addressed OneBeacon's argument that lost profits are not covered under the policy. For reasons akin to those provided with regard to whether the plaintiff is the real party in interest, however, the Court has determined that the issue of insurable interest remains for trial.[15]

Accordingly,

IT IS ORDERED that the motion for summary judgment filed by Celtic Marine Corporation is DENIED. (Rec. Doc. 14).

IT IS FURTHER ORDERED that the motions for partial summary judgment filed by Ingram Barge Company are DENIED. (Rec. Doc. 35).

IT IS FURTHER ORDERED that the motion for summary judgment filed by OneBeacon Insurance Company is DENIED. (Rec. Doc. 40).

---

[15]It is also unclear to the Court the effect, if any, of the recent Stipulation between Ben-Trei and OneBeacon on this motion, since the plaintiff stipulates "that it does not seek to recover insurance proceeds" for the undamaged cargo on ING-7581. (Rec. Doc. 118).

IT IS FURTHER ORDERED that motion for partial summary judgment filed by Ingram Barge Company is DENIED. (Rec. Doc. 63).

The parties are encouraged to arrange for a settlement conference as soon as possible. Alternatively, the matter will proceed to trial where a full record can be developed.

**The Court does not welcome motions to reconsider or additional motions for summary judgment.**

New Orleans, Louisiana, this 5th day of February, 2010.

_____
HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE